for provision of oral argument not suitable to be seen in the Court of Human Rights. I am Mr. Samuel M. Bro wrapping my cards as I respond. Attorney General and Mr. Lane, I would like to reserve three minutes for rebuttal please. May it please the Court. The first thing I would like to do is address what the trial court did wrong with regard to concluding that land was not disabled at discharge. The testimony from Dr. Cassidy was that he had a record of physical impairment substantially limiting his ability to stand. Dr. Cassidy also testified that the last time he saw land in February of 2014 he was disabled from standing. He didn't make that opinion in a vacuum. Land had in the last year and a half before he was discharged substantial physical breakdowns. He had carpal tunnel surgery, multiple cortisone injections in his knee, surgery for partial knee replacement, spondylolisthesis, lumbar stenosis, sciatica. He was subject to substantial lifting and standing from June until October 23rd. And so I think he clearly was disabled under the U.S. Code 12-102. The trial court rested its opinion on the fact that there were no active medical restrictions at the time that he was discharged. Under Jones v. Honda, the court said that... In fact, the doctor said he could go back to work, right? We had two treating physicians. He had a back issue and he had a knee issue. At the time that, on October 23rd, he had no active medical restrictions. Was that your question? Yeah. Okay. It did say he could go back to work. Okay. So why doesn't that support the district court? Why doesn't... Excuse me. Why doesn't that support the district court? That he was not disabled? Right. Because of the statute that allows definition of disability, which would be 42 U.S.C. 12-102, which says... Did he complain to his supervisors that he couldn't lift a 50-pound bag or couldn't whatever he was supposed to do? He would complain to his immediate supervisor, the store manager. He said he would complain that he couldn't stand and... It was a standing issue, wasn't it? It was mostly a standing issue, yes, Your Honor. He was restricted from both, but the standing was the thing that he was really restricted from. Okay. So, I believe based on the statute of the record of disability qualifies him as disabled at that time based on the testimony of Dr. Cassidy and his physical condition that he testified on. Why did the supervisors at the store say he couldn't sit down, you're just going to have to keep on walking around and picking up things, or did they say, well, sit down, or do we know what to say? Mr. Land described it as a certain intolerance and attitude. The real problem was the store manager was fairly supportive of Mr. Land, and that's who he was to report to according to the assistant manager job description, and that's who he talked to. The district managers were either in another state or had 17 other stores and were there infrequently. Well, how'd they know he wasn't standing up and walking around? Where'd that come from if the local supervisor said it's okay? Immediately after surgery, there were... He was on the active medical restrictions. They talked about it in August emails about him being disabled, and the district manager says, we're going to work on him, that he's clearly disabled, and while he's still on those severe restrictions for standing, he has a meeting on August 30th, and it follows it up with an August 30th email that says, I want you to be out of the office six to six hours a day, at least six hours a day, which would require him to be on his feet. That's immediately after they talked about the restrictions requiring him just to be on his feet for two hours. The district manager here, is this Hash? That is Hash, yes, your honor, and then kind of chastised him for saying, you need to come in early and you need to leave late. This is knowing full well that he's on active restrictions. The other thing that I think was very telling about that was that there was a plan that he was going to work on him, and he supposedly had inquired about what those restrictions were. Then he, just three weeks later, he had him doing more than that based on the documentation. What's your take on the pretext point? On pretext, I think that it comes down to three things, documentation. If you look at the documentation, everybody admits he did a good job. That gets back to your point that Land and Hash had a pretty good relationship, but Hash wasn't the decision maker. Hash was the decision maker. Everybody at one point in the depositions denied being the decision maker, but they have argued that Hash was the decision maker. He was certainly the terminator. Was Hash then his direct report? No, that's Wynn. Oh, okay. Well, that's my mistake. Wynn is the store manager. Okay, store manager. So the store manager and Land have the good relationship. At termination, to say how good a job that Land had done, the termination came as a surprise on March the 21st to Wynn, and Wynn begged him to not fire Land. He said, I couldn't make it without him. Right, but I guess my point is who cares about the store manager's views if the store manager's not the decision maker? That was what I'm trying to get at. I think it comes down to whether he did a good job or not, and the store manager who was there with him every day said he did a good job. The human resources person that looked over the files said he did a good job. Even Hash, who reviewed the evaluations, called it peaches and cream, said he did a good job. Everybody in this case had said Land did a good job. But yet, they put him on this PIP, which was a 45-day PIP that says if you don't improve, you may be disciplined further, including termination, and the date of the termination is 48, 49 days after the start of that. Am I right on my facts? I'm not sure that I've got the exact days right, but yes, and the interesting thing about that was they put him on the PIP, which is a disciplinary-type thing, despite conversation with HR that kept saying you don't have documentation to do what you're trying to do to Land. There is no Southern States documentation that says that he did not do a good job, what he needed to improve on, that he needed to improve, and yet they put him on a PIP plan. In Ford, which was cited by Southern States, and I think it's just absolutely contrasting, in Ford, it was decided on the basis of documentation. They documented poor performance. They documented that the lady was in the bottom 10% of her class. They documented many absences that caused mistakes, and they said the documentation was substantial. Ford also said that the fact that there was the documentation was significant in this case. In this case, the same rule applies, but the significance is there was no documentation of any poor performance. As a matter of fact, at the PIP. As a matter of law, is paper documentation required to show lack of pretext? I mean, it can help, but it's not required by law, is it? Well, what we have here is they said he was fired for poor performance. We think that's masking the real reason that he was fired, which was his disabilities. But it couldn't have, at least in principle, putting him on the PIP couldn't have anything to do with the retaliation claim, because they put him on the PIP well before this letter was sent, right? No, the letter was sent. That's right. They put him on the PIP. The retaliation claim was he clearly engaged in protected activity. He wrote and... I'm not familiar with it. I just wanted to make sure I had the separation between the two claims. You're saying they put him on the PIP without justification because of his disability? All right. But that couldn't have... Putting him on the PIP couldn't have been impacted by the letter because it happened significantly earlier. The actual firing, you could claim, was affected by it, but not putting him on the PIP. That's exactly right, Your Honor. This is really a question for both of you. On the pretext points, there's a pretext point with the discrimination and retaliation claims, right? The pretext would be the same. That's my question. In other words, if you're right that on the discrimination claim, there's sufficient evidence of pretext to go to a jury, I take it you would think the same is true for the retaliation claim, but that's a helpful way of saying it. Is the opposite true? If there's no evidence of pretext on the discrimination claim, does it follow there's no recognizable evidence of pretext in the retaliation claim? I'm trying to figure out if both of you agree that what's true for one is true for the other. Judge, I'm not really sure how to answer that. You were pretty confident about the first one. If it helps, you're going to go... I thought I heard you say pretext is the same for both. It is. I guess I would have to answer that yes. I just never thought about it in the backward sense. Yeah, no. It's always best to be hopeful. I would like to add one thing with regard to the protected activity. With regard to the protected activity, the question is whether they were put on notice. Human Resources, Donna Garcia, testified specifically that, in this case, as part of the documentation that was sent to Hash, and that he immediately fired thereafter... Yeah, your light's on, but go ahead and finish the point. Go ahead. ...that she recognized that Hash's story about the war horse raised red flags for her with regard to disability discrimination. Thank you. You get your full rebuttal. Thank you. Thank you. Mr. Salisbury? Good morning. My name is Josh Salisbury, and I'm counsel for Southern States. May it please the court, this is a disability discrimination retaliation case about a man who ran his own small business for decades, but after 30 years of doing that, and frankly was not able to adapt to working for others in the larger corporate culture. Granted, Judge Hood found that Southern States didn't handle things perfectly, and we're not disputing that here, but because the law doesn't require perfect decisions, because Mr. Land cannot show he was disabled or considered disabled at the time of termination, and that is the law, because this court needs to evaluate Southern States' stated reasons for terminations by looking at the facts as they appear to the decision makers, and because Mr. Land must produce significant probative evidence from particular points of record, not subjective belief, not mere disagreement. He's got to go beyond that to show his case. The court needs to uphold Judge Hood's decision to grant summary judgment, which ... What's your take on my pretext question? Is it the same analysis for both claims?  No, sir. I don't think it is. It could be good for you, because you could show there was no pretext in the discrimination claim, and therefore you might say it follows there was no pretext in the retaliation claim, but it could be bad for you, because you could be stuck with the finding that there's a cognizable issue of fact and pretext in discrimination, and therefore that would carry over to retaliation. It sounds like from your body language that you think they're quite different. I do think they're different, Your Honor, and Judge Sartin, actually I think a big part of the problem here in this case is that our plaintiff has conflated his discrimination and retaliation claims, and that's why we have this hangup in the briefing on whether or not Mr. Land was required to show he was disabled at the time of termination, to your point. Well, can I say why I think he's conflating them, and why I was conflating them? Because I don't understand what his letter is. The letter that's the source of the retaliation claim doesn't really spell out the misconduct, except to say hostile work environment, and what I ... But when I look at the record, you help me on this, but when I look at the record, all I can see is an environment that's problematic when it comes to discrimination against someone with a disability, or discrimination based on FMLA leaves, so that's why it seems fair to think there's a lot of connection between the two claims, that what's ... The retaliation is about complaining about disability discrimination, and that leads you to the question whether it really was ... There really was discrimination, so that's why the conflation's going on. I think that's why your friend on the other side answered the question the way he did, but you seem to be thinking they're quite separate. I think they are two different issues, Your Honor. With the discrimination, the issue is, was the actual physical condition, the disability, was that in place at the time, such that it could have motivated Southern State's decision to take the termination action? What do you think the retaliation's about? I think the retaliation, by Mr. Land's own briefings and pleadings on appeal anyway, is about what he said in his March 10th performance improvement plan response, March 23rd, excuse me. March 10th performance improvement plan response, where he says, listen, I think I'm being discriminated and harassed. Now, on appeal, Mr. Land takes the position, I was signaling, and Southern State should have picked up that that was disability discrimination. There's a significant problem with the record not supporting that. Number one, it was vague, and not just vague in the sense of, well, you didn't use magic words. It's lacking the context that exists in the other cases Mr. Land has cited to this court, where additional facts such as the case that was just submitted earlier this week, the Lum case. But if he wasn't complaining about disability discrimination, there's no such thing as retaliation claims about, they're not liking me. It's retaliation for protected conduct. So protected conduct would be complaining about being discriminated against in violation of the anti-discrimination laws with respect to disability. Do you understand the point I'm making? I do understand the point. Okay, so what's your theory of what his retaliation claim is if it's not about disability discrimination? I think he says his retaliation claim is about disability discrimination. I think he thinks, and I think the record shows he thought he was being retaliated against for things such as perhaps they want to replace me with this younger relative of Mr. Sweatt. So you think it's an age discrimination? Which he's abandoned on appeal. Or a nepotism thing, which of course, as we know, is not a cause of action. Okay, so we're still left with only disability. We're left with disability as his theory, but not what the record supports as what he was complaining about. That's his theory on appeal. That is not what he was complaining about, and that's not what the record supports he was complaining about at the time. You're saying this is not a stand-alone claim. It has to be related to the disability, or it doesn't relate to anything? I'm saying it doesn't relate to anything that is actionable or before this court on appeal. The warhorse analogy brings it back into context here. He cites, and we talk about context matters when we're raising vague claims, correct? That's the case law. They're looking for context. His context is the warhorse case, which Judge Hood correctly found no reasonable juror could inferring anything in terms of protected class or status. In fact, the record shows that Mr. Land thought, if anything, warhorse had to do with his age, which he's completely abandoned now, or perhaps this desire to replace Mr. Land with a relative here. None of those are disability action that he's presenting to southern states at that time, if anything. But the fact of the matter is, he was incredibly vague. We know that, while you don't have to use magic words, you do have to give some context to show you're not just throwing the term harassment or discrimination around generically. And that gets done quite a bit in the employment context. The question is- You're saying for this retaliation that he should have said what he did, but because I'm older, or because I can't stand that around all day long, or something like that, to show exactly what the retaliation involved. I'm sorry, Judge Tyler, I'm not sure I understand your question. You think the retaliation has to be clued in with because of disability, or because of age, or sex or gender coming in? I think it has to be clearer than what it was. If you look at the other cases that were cited, you have, for example, in a gender discrimination case, a young lady not only saying that I'm being harassed, but saying he's treating me with derogatory comments, he's being incredibly diminutive towards me, you have a clear may be a male-female dichotomy. But more importantly than this, you have a timing issue. And that's the other problem the retaliation claim doesn't work. The law is, the record is uncontroverted, uncontroverted, beyond speculation that the decision to terminate was already made by the time the March 10 letter was submitted. That's the record, and there's nothing in it to refute it. So let me take you back to what we were, we use the word pretext, but basically your legitimate non-discriminatory reason is his poor performance, as indicated by the PIP, which doesn't get cleared up, isn't that, and therefore since your reason is legitimate and is not undercut by any other evidence, there's no pretext. Why isn't that exactly the same for both claims? I would have thought that since you at least definitely below got a finding of no pretext on the first, that you would want them to be the same. So I want to get your theory as to why they're not the same. The claim, the claims are different, but I would have thought your defense of legitimate non-discriminatory reason and no pretext. Our legitimate non-discriminatory reason defense is the defense to both. But you're looking at a different issue in terms of what is each claim based upon. The claim of discrimination is based on my physical condition. Sure, I understand that. And the retaliation claim is based on me complaining about how I'm treated because of my physical, they're very close related, I can't deny that Judge Boggs, in fact, I'm reading my own notes and it's telling me that. That I'm asking about, because you win, you win if you have a legitimate non-discriminatory reason. In both cases, in both claims. It defeats the pretext of you were discriminating against me because of my disability, it defeats the pretext of you were retaliating against me because I made this complaint, vague though it may be. They're very closely related, I do think there's some separateness to them, but yeah, I can't deny they're closely related. Would your honors like me to continue? I don't think we have any other questions. We're good if you're good. Yeah, exactly. Your honor, if that would be the case, I think I'd better sit down. Alright, thank you. Mr. Acton. Thank you, your honor. The first thing I'd like to do is to dispute, said there was absolutely no reason to think that the decision had not already been made. Donna Garcia, with Human Reasons, was an integral part of that decision. She was working with HASH with regard to land. At the time, she was opposing, at the time the letters were transmitted to HASH, she was opposing termination. She, I guess, hoped to have success in not having him terminated. HASH himself said, we didn't even consider any other options and wouldn't elaborate in terms of what those options were until seven to ten days before. After the submittal of that letter, submitted on March the 11th, on that day, Garcia, who opposed termination in a change of protocol, was taken off the case. That same day, the files that she had on HASH were taken and given to somebody else in Human Resources to review. Obviously, the decision had not been made and there was significant change of protocol to get to the point, after that, that he was terminated. And that's in the record and it certainly rebuts anything that Mr. Salisbury just said about that. What's your best evidence of times he raised a disability problem, asked for an accommodation, and didn't get it? Six, eight. No, no, what instances, when, what exactly happened? Well, it starts off with when, on August 30th. I'll tell you where I'm coming from is I thought when he asked for accommodations, he got them. I thought that was the basic history and chronology of the case. And then the doctor, at least this one doctor, says, you're good to go back to work without restrictions. And so, I guess I thought at least up to that point, when he said he needed an accommodation, he got it. Tell me if I'm wrong about that and then tell me if what happened after that, that shows he asked for an accommodation, he didn't get it. We did not agree with that. That was the judge's opinion. Give me the most glaring example of why Judge Hood was wrong on this point. Just an instance like, on this date, he asked for this and that didn't happen. What comes to mind for me is that October, August 30th, when Hash says, I want you to be on the floor six to eight hours. He is still subject to not being on the floor on his feet for more than two hours at a time. He's to report to his store manager. He goes and says, look, can you do something with Hash? I can't be on the floor. And what happens? Does he get accommodation or not? No, he is told. He has to go work six to eight hours? He then works to six to eight hours just as Hash required? He does, Your Honor. Okay. You said October 30th. I meant August 30th. Okay. Because October 23 is the date when all restrictions are lifted. Yes. I said October. I'm sorry. I meant August. Okay. And the other thing that I would add. It's August 30th is what we're talking about. August 30th. That's the best example of something where he wanted accommodation, didn't get it. That's right. Did Wynn tell Hash about this complaint of August 30th? We have no proof that he did. He said he would take care of it and . . . He, Wynn . . . He, Wynn said he would take care of it and . . . And he did take care of it. I mean, they accommodated him at the store at that time. No, he continued to work the six to eight hours despite his restrictions of standing no more than two hours. What did Wynn mean by, I'll take care of it? With Hash. He'll talk to Hash. And he didn't? I do not know. No proof of it. I know that there was no chance . . . But Wynn communicates to Land, I'll take care of it. That's right. Well, isn't that important? It is important. You know, that was the protocol and the assistant in the job description that all of a sudden Hash started intervening and after those emails went out in August, there was increased scrutiny and every two weeks when he came down, he would have something else, another task for Land to do, which matted with what Wynn was doing. At one point, Land complained to Wynn, said, look, he's telling me to ignore you. I feel caught between a rock and a hard spot. What's going on here? And that's all in the record. The final thing that I'd add about the record is the judge's adoption of the record was solely based on the oral testimony at deposition a year and a half after Land was fired and found substandard performance despite what the documented record says or in the face of the documented record. All right. Thank you. Thank you. Thanks to both of you for your helpful briefs and argument and for answering our questions. We appreciate it. The case will be submitted and the clerk may call the next case.